

MAY 26 2026 PM2:43
FILED - USDC - FLMD - TPA

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

ORLANDO DIVISION

**Ciara Williams,**

    Plaintiff,

v.                                              Case No.: 6:26-cv-00214-CEM-NWH

**Wayfair, LLC,**

    Defendant.

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Ciara Williams ("Plaintiff"), proceeding pro se, sues Defendant Wayfair, LLC ("Defendant" or "Wayfair") and alleges:

## I. JURISDICTION AND VENUE

1. This action arises under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.

2. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and 42 U.S.C. § 2000e-5(f)(3).

3. Venue is proper in this District because the unlawful employment practices alleged herein occurred in this District, Defendant conducts business in this District, and Plaintiff worked for Defendant in this District.

4. Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), EEOC Charge No. 511-2025-03862, which was dual-filed with the Florida Commission on Human Relations ("FCHR") pursuant to the agencies' worksharing agreement. Plaintiff's charge alleged harassment, hostile work environment, disparate treatment, favoritism, and retaliation arising from her employment at Defendant's facility. The claims alleged herein arise from the same facts and course of conduct set forth in that charge and could reasonably be expected to grow out of the EEOC's investigation of those allegations.

5. Plaintiff received a Notice of Right to Sue on or about November 17, 2025, and this action is timely filed within ninety days thereof.

6. To the extent Defendant raises exhaustion as a defense to any claim, Plaintiff's EEOC charge expressly alleged "disparate treatment" and "favoritism" among management and employees — language that directly encompasses the racially discriminatory placement and training decisions

described herein. The Eleventh Circuit applies a broad scope-of-investigation standard under which judicial claims are permissible if they are like or related to, or grew out of, the allegations contained in the EEOC charge. Plaintiff's race discrimination and hostile environment claims satisfy that standard because they arise from the same facts, same actors, and same course of conduct described in the charge and would have been uncovered in any reasonable EEOC investigation of the disparate treatment and favoritism allegations.

## II. PARTIES

7. Plaintiff Ciara Williams is a Black woman and a resident of Florida.

8. Defendant Wayfair, LLC was Plaintiff's employer within the meaning of Title VII and, at all relevant times, employed fifteen or more employees.

9. At all relevant times, Defendant acted through its managers, supervisors, human-resources personnel, and other agents, including but not limited to:

    a. Shedrick Stokes, Terminal Manager;

    b. Jeffrey Tormeno, Transportation Manager;

    c. Andre Bates, Plaintiff's direct supervisor; and

    d. Stella Stephens, a non-managerial employee whom Defendant nevertheless allowed to exercise de facto supervisory authority over Plaintiff and other employees.

## III. FACTUAL ALLEGATIONS

### A. Employment Background

10. Plaintiff began working for Defendant on or about May 16, 2024, as a Warehouse Associate at Defendant's facility in the Middle District of Florida.

11. Plaintiff remained employed until Defendant terminated her employment on or about March 14, 2025.

12. Throughout her employment, Defendant subjected Plaintiff to unequal treatment, tolerated harassment directed at her, denied her training and advancement opportunities, failed to investigate or remediate reported misconduct, and ultimately terminated her employment under circumstances in which race and retaliation were motivating factors.

13. Plaintiff consistently tried to perform her job, requested management intervention, and sought resolution rather than escalation.

### B. Supervisory Conflict of Interest: Andre Bates

14. During Plaintiff's employment, Andre Bates served as Plaintiff's direct supervisor and held authority over her working conditions, scheduling, timekeeping, training, complaint handling, and day-to-day employment experience.

15. During the same period, Bates initiated and pursued a course of unwelcome and coercive sexual conduct with Plaintiff while on Defendant's premises and during Plaintiff's paid working hours, including pulling Plaintiff off active work duties, bringing her to the conference room or other areas of the facility, and conditioning workplace support and advancement on her compliance with his sexual demands.

16. When Plaintiff did not comply or attempted to disengage, Bates became dismissive, withheld assistance, and otherwise changed his treatment of Plaintiff in ways that directly affected her ability to perform her job and access support from her supervisor.

17. Bates simultaneously used promises of advancement — including representations that Plaintiff was being prepared for a transportation role — to keep Plaintiff compliant and to dissuade her from reporting the conduct or leaving her employment.

18. Because Bates controlled whether Plaintiff's complaints were escalated, whether she received operational support, and whether workplace conflicts were resolved in her favor, his conduct created a direct conflict of interest that impaired Defendant's ability to respond to Plaintiff's complaints throughout her employment.

19. Other employees became aware of Bates's conduct and its effect on the workplace, and internal complaints about favoritism and supervisory-boundary violations were made, putting Defendant on notice that Bates's conduct was distorting workplace supervision and tainting Plaintiff's complaint channels.

20. On information and belief, Defendant later became aware of the full scope of Bates's conduct and terminated or otherwise separated him from employment, which confirms that Defendant recognized the supervisory-boundary violation and the harm it caused.

21. The facts in this section are included not as a standalone sex-discrimination claim, but as factual context establishing: (a) the conflict of interest that compromised Plaintiff's complaint channels; (b) coercion and management notice; (c) the mechanism by which Defendant's failure to supervise its own managers worsened Plaintiff's working conditions; and (d) the basis for Plaintiff's reasonable and documented experience of the workplace as hostile and unsafe.

## C. Hostile Work Environment: Stella Stephens

22. Beginning in or around August 2024, Plaintiff was subjected to ongoing, unwelcome, severe, and escalating hostility from Stella Stephens.

23. Stephens did not hold a formal management title, but Defendant allowed her to function as though she possessed supervisory authority over Plaintiff and other employees.

24. Specifically, Defendant permitted Stephens to: direct Plaintiff's work assignments; instruct Plaintiff to get off the clock; insert herself into disciplinary matters; and influence how workplace disputes were resolved — all without formal authority to do so.

25. Stephens repeatedly addressed Plaintiff in an aggressive, abusive, intimidating, and derogatory manner, including publicly berating Plaintiff, directing profanity at Plaintiff, and deliberately undermining Plaintiff's ability to perform her duties.

26. Defendant knew or should have known that Stephens was exercising unauthorized authority over Plaintiff because: management directly observed incidents involving Stephens; Plaintiff

reported Stephens's conduct to multiple members of management and HR on multiple occasions; and other employees were aware of and affected by Stephens's conduct.

27. Defendant failed to meaningfully discipline Stephens, failed to separate Stephens from Plaintiff, and failed to restore an appropriate workplace structure, allowing the hostile conditions to persist and worsen.

28. The internal circulation of employee complaints — including coworkers expressing frustration that management could not "make [Stephens] do what's right" — further demonstrates that Defendant had actual notice of the hostile conditions and chose not to act.

## D. December 17, 2024: Unequal Discipline and Management Inaction

29. On or about December 17, 2024, an incident occurred that illustrates Defendant's tolerance of abusive conduct, its unequal enforcement of workplace rules, and its deliberate singling out of Plaintiff.

30. Earlier that day, Plaintiff briefly left work because her son became ill at school and she needed to attend to him. She later returned to continue her shift.

31. When Plaintiff returned, she was not engaged in any active conflict.

32. Another employee indicated there was an issue about something Plaintiff had allegedly said on a prior day. Plaintiff briefly and calmly approached that employee to clarify the matter directly, consistent with ordinary workplace norms.

33. That conversation was non-violent, non-disruptive, and concluded without any altercation.

34. Notwithstanding this, Stephens ordered Plaintiff — and only Plaintiff — to get off the clock, even though Plaintiff had not engaged in any misconduct. Stephens did not require the other involved employee to get off the clock.

35. When Plaintiff questioned why she alone was being singled out, Stephens escalated the situation by directing profane and abusive language at Plaintiff, including "f*** you," calling Plaintiff a "b****," and making obscene gestures toward her.

36. Terminal Manager Shedrick Stokes was present, witnessed all or part of the confrontation, and did not intervene, correct Stephens's conduct, or de-escalate the situation.

37. Plaintiff — not Stephens — was then removed from work and escorted out of the building.

38. Stephens faced no meaningful discipline for initiating and escalating the confrontation.

39. After the incident, rather than investigate or remediate, management told Plaintiff to keep her head down. When Plaintiff repeatedly requested a resolution meeting, managers including Stokes, Tormeno, and Bates told her that Stephens was "not willing to sit down and talk," and no corrective action followed.

40. The December 17, 2024 incident reflects singling out of Plaintiff, unequal discipline, and Defendant's deliberate tolerance of abusive conduct by a non-managerial employee it had vested with de facto authority. The incident occurred within a monitored facility and Defendant possesses internal records, video footage, and clock logs corroborating Plaintiff's account.

## E. Race-Based Training and Placement Disparities

41. Plaintiff expressed interest in transportation-related training and advancement opportunities throughout her employment and was qualified for those opportunities.

42. Despite Plaintiff's qualifications and repeated requests, Defendant bypassed her and instead selected and trained a white employee, Jonah, for the transportation opportunity Plaintiff sought.

43. On or about January 7, 2025, when Plaintiff asked Bates about the training decision, Bates initially stated that Jonah's assignment was "temporary."

44. Bates then sent Plaintiff a written communication stating, in substance, that "Jeff wants the white ppl together" and that "[a]ll the white folks [are] in the office, and the [Black employees are] on the floor."

45. Bates tied that racial statement directly to the training and assignment decision by referencing who would run "deluxing" if Jonah were moved — connecting the racial placement pattern explicitly to the operational decisions at issue.

46. Bates then advised Plaintiff to "trust the process just wait," which Plaintiff reasonably understood as confirmation that the training decision was intentional and the racially stratified placement pattern was known and accepted at the management level.

47. This written communication, attributed to Transportation Manager Jeffrey Tormeno through Bates, constitutes direct evidence of a racially discriminatory mindset influencing workplace placement, training, and advancement decisions at Defendant's facility.

48. Consistent with this pattern, Plaintiff — a Black employee — was denied training in transportation and assigned to floor roles, while white employees were placed in office or preferred positions.

49. This denial disadvantaged Plaintiff with respect to her job classification, compensation potential, and career trajectory relative to the white employee who received the training she sought.


## F. March 6, 2025: Off-Site Vehicle Following

50. On or about March 6, 2025, after Plaintiff's work shift ended, Stella Stephens followed Plaintiff by vehicle for a period of time after Plaintiff left Defendant's premises.

51. This conduct was deliberate and caused Plaintiff serious fear, distress, and concern for her physical safety.

52. Plaintiff reported the incident to management and Human Resources the same day or shortly thereafter.

53. Defendant failed to take any meaningful protective or corrective action in response.

54. The off-site following was carried out by the same person whose workplace harassment Defendant had already been repeatedly informed of and had failed to correct. It was part of the same continuing course of hostility that Defendant had enabled by allowing Stephens to maintain de facto authority and face no consequences for her conduct.

55. Defendant's failure to respond to the March 6, 2025 incident compounded the hostile environment, intensified Plaintiff's fear, and demonstrated that Defendant would not protect Plaintiff regardless of the severity of the conduct directed at her.

## G. Management Knowledge and Pattern of Inaction

56. Throughout her employment, Plaintiff repeatedly and formally reported: Stephens's harassing and threatening conduct; the racially discriminatory training and placement decisions; the conflict of interest created by Bates's supervisory conduct; and the unsafe working conditions.

57. In addition to formal reports, Plaintiff communicated ongoing concerns through direct conversations and written communications with management, putting Defendant on actual, repeated notice of the problems she was experiencing.

58. Defendant took no meaningful corrective action in response to any of these reports. Stephens was never meaningfully disciplined, never separated from Plaintiff, and never stripped of the de facto authority Defendant had permitted her to exercise.

59. Rather than address the environment, management consistently told Plaintiff to tolerate the conduct and keep her head down — effectively communicating that the hostility directed at Plaintiff would not be remedied.

## H. Mental Health Harm While Still Employed

60. Beginning in November 2024, while still employed, Plaintiff experienced severe emotional distress directly caused by Defendant's conduct, including anxiety, panic attacks, crying episodes, and suicidal ideation.

61. Plaintiff sought mental health treatment through Spring Health, Defendant's employee assistance resource, while still employed, and attended documented intake and therapy appointments between November 17, 2024 and December 3, 2024.

62. These records establish that Plaintiff subjectively experienced the workplace as hostile and abusive while still employed — months before her termination — and corroborate both the severity of the environment and the compensatory damages Plaintiff suffered.

## I. Protected Activity, Retaliation, and Termination

63. Throughout late 2024 and into 2025, Plaintiff engaged in protected activity under Title VII by repeatedly opposing what she reasonably believed to be unlawful race discrimination, a racially hostile work environment, sexual coercion by a supervisor, and related workplace misconduct, and by reporting those concerns to management and Human Resources.

64. Following Plaintiff's protected complaints, Defendant subjected Plaintiff to escalating adverse treatment, including: increased scrutiny; removal from work following the December 17, 2024 incident; continued denial of training and advancement; inaction after the March 6, 2025 following incident; pressure to resign on March 13, 2025; and termination on March 14, 2025.

65. On or about March 13, 2025, Plaintiff informed management of urgent family circumstances including housing and childcare needs. Rather than offer neutral assistance or a fair process, Defendant pressured Plaintiff to resign voluntarily.

66. On or about March 14, 2025, Defendant ended Plaintiff's employment. Defendant initially characterized the separation as a voluntary resignation; Plaintiff disputes that characterization. The pressure applied on March 13, the close timing to Plaintiff's protected complaints, and the escalating pattern of adverse treatment support the conclusion that the termination was involuntary.

67. The escalating pattern of adverse treatment following each of Plaintiff's protected complaints, and the close temporal proximity between Plaintiff's complaints and her March 14, 2025 termination, support a causal connection between Plaintiff's protected activity and Defendant's actions.

## J. Pretext: Attendance and Scheduling

68. Plaintiff's occasional schedule variations were known to, accepted by, and often expressly approved by management at the time they occurred. Defendant did not consistently discipline Plaintiff for attendance-related issues at the time they allegedly occurred.

69. Any belated reliance by Defendant on attendance or scheduling as justification for adverse actions is pretextual — inconsistent with Defendant's prior acceptance of the same patterns and with the temporal relationship between Plaintiff's protected complaints and the adverse actions that followed.

## K. Damages

70. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered:

    a. lost past wages and benefits;

    b. lost future wages and diminished earning capacity;

    c. severe emotional distress, anxiety, panic attacks, and psychological harm;

    d. disruption to housing, transportation, and family stability;

    e. mental health treatment costs; and

    f. other compensatory damages permitted by law.

## IV. CLAIMS FOR RELIEF

### COUNT I – HOSTILE WORK ENVIRONMENT IN VIOLATION OF TITLE VII

71. Plaintiff realleges paragraphs 1 through 70 as if fully set forth herein.

72. Plaintiff is a Black woman and therefore a member of protected classes based on race and sex under Title VII.

73. Plaintiff was subjected to unwelcome harassment because of her race, including: a racially stratified workplace placement system relegating Black employees to floor roles while white employees were placed in office or preferred positions; the January 7, 2025 written communication explicitly attributing that placement pattern to management's racial preferences; unequal discipline and singling out during the December 17, 2024 incident; and Defendant's sustained tolerance of Stephens's abusive conduct directed at Plaintiff.

74. Plaintiff was also subjected to unwelcome conduct of a sexual nature because of her sex by her direct supervisor, including coercive sexual requests made on Defendant's premises during working hours, tied to job benefits and withheld workplace assistance when Plaintiff did not comply.

75. The harassment was sufficiently severe and pervasive, in the totality of the circumstances, to alter the terms and conditions of Plaintiff's employment and create an objectively and subjectively hostile and abusive working environment. The conduct includes: nearly eight months of aggressive and abusive conduct by Stephens; the December 17, 2024 public confrontation witnessed by management with no corrective action; the March 6, 2025 off-site vehicle following; coercive sexual conduct by a direct supervisor; direct written evidence of racially motivated placement decisions; and a sustained pattern of management inaction across all reported incidents.

76. Plaintiff subjectively perceived the environment as hostile and abusive, as demonstrated by her repeated complaints to management and HR and her documented mental health treatment through Defendant's own employee assistance program while still employed.

77. A reasonable person in Plaintiff's circumstances would also find the environment hostile and abusive.

78. Defendant knew or should have known of the harassment through Plaintiff's direct and repeated reports to Stokes, Tormeno, Bates, and HR; management's personal observation of the December 17, 2024 incident; internal complaints about Bates's conflict of interest; and Plaintiff's report of the March 6, 2025 following incident.

79. Defendant failed to take prompt and effective remedial action.

80. As a direct and proximate result of Defendant's hostile work environment, Plaintiff suffered the damages described herein.

## COUNT II – RACE DISCRIMINATION IN VIOLATION OF TITLE VII

81. Plaintiff realleges all preceding paragraphs as if fully set forth herein.

82. Plaintiff is Black and a member of a protected class under Title VII.

83. Plaintiff was qualified for the training, placement, and advancement opportunities she sought, including the transportation-related training for which she repeatedly expressed interest and demonstrated readiness.

84. Defendant denied Plaintiff those opportunities and instead selected Jonah, a white employee with similar or lesser qualifications, for the opportunity Plaintiff sought.

85. Defendant maintained a racially stratified workplace structure in which, as Bates's January 7, 2025 written communication explicitly reflects, management directed that white employees be grouped together in office or preferred roles while Black employees remained assigned to the floor.

86. The denial of training and advancement disadvantaged Plaintiff in the terms and conditions of her employment with respect to job classification, compensation potential, and career advancement.

87. Race was at least a motivating factor in Defendant's decisions regarding Plaintiff's training, placement, classification, and working conditions.

88. As a direct and proximate result of Defendant's race discrimination, Plaintiff suffered the damages described herein.

## COUNT III – RETALIATION IN VIOLATION OF TITLE VII

89. Plaintiff realleges all preceding paragraphs as if fully set forth herein.

90. Plaintiff engaged in protected activity under Title VII by opposing conduct she reasonably believed to be unlawful discrimination, a hostile work environment, and related misconduct, and by repeatedly reporting those concerns to management and Human Resources.

91. Following Plaintiff's protected activity, Defendant subjected Plaintiff to materially adverse employment actions, including: increased scrutiny; removal from work and escort from the building on December 17, 2024; continued denial of training; inaction after the March 6, 2025 following incident; pressure to resign on March 13, 2025; and termination on March 14, 2025.

92. A causal connection exists between Plaintiff's protected activity and the adverse actions taken against her, supported by the escalating pattern of adverse treatment following each protected complaint and the close temporal proximity between Plaintiff's most recent complaints and her termination.

93. Defendant's stated reasons for its actions, to the extent any are offered, are pretextual for the reasons described herein.

94. As a direct and proximate result of Defendant's retaliation, Plaintiff suffered the damages described herein.

## V. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Ciara Williams respectfully requests that this Court:

    A. Enter judgment in Plaintiff's favor and against Defendant on all Counts;

    B. Declare that Defendant violated Title VII of the Civil Rights Act of 1964;

    C. Award back pay, lost benefits, and all other make-whole equitable relief;

    D. Award front pay or reinstatement as appropriate;

E.  Award compensatory damages for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses;

F.  Award punitive damages as permitted by law;

G.  Award costs of suit; and

H.  Award such other and further relief as this Court deems just and proper.

## VI.  DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury on all issues so triable.

Respectfully submitted,

**Ciara Williams**

Plaintiff, Pro Se

11181 Riley Pines Circle

Gibsonton, FL 33534

(656) 252-3838

ciarawilliams1219@gmail.com